Mr. Rosenberg, do you want to introduce somebody for us? I do, Your Honor. I would like to introduce Zachary Warbaugh, who is a third-year student at the West Virginia University College of Law, and he is a qualified student who will present argument today, with your permission. I very much look forward to hearing from him. Thank you, Your Honor. Mr. Warbaugh. Good afternoon, Your Honors, and may it please the Court. In 2019, Mr. Holley was sentenced to 127 months in prison. Now, the BOP and the District Court are taking the chance at transforming that sentence into a death sentence by denying Mr. Holley access to the only form of life-saving care available for his condition, a kidney transplant. This Court should reverse the District Court's decision and remand with instructions to grant compassionate release for two reasons. First, because end-stage renal disease plainly constitutes a terminal illness with an end-of-life trajectory, and second, because even if not, the District Court abused its discretion by denying Mr. Holley's motion for appointment of counsel and an expert nephrologist that would have helped the District Court understand issues its decision makes clear it did not. Is your first argument, I understand the second one, but is your first argument that it's a per se question, that if you have a medical report that you have end-stage kidney failure, that that necessarily means that you have a qualifying condition? Yes. No matter the scenario, that it's a just yes or no question, and if there's testimony that you have such disease, you qualify. Yes, Your Honor, you qualify for extraordinary and compelling reasons. Now, there still is the limiting principle of going through the 3553A factors, so it's not to say that anybody with end-stage renal failure or any end-stage organ disease automatically qualifies for compassionate release. How is the District Court supposed to make the determination whether it is end-stage renal failure versus something short of that? Yes, Your Honor, it's end-stage is when it progresses to stage 5, which is 15% kidney function. There's no dispute here, and the government does not dispute. On the record, Joint Appendix at 94, Mr. Holley does. Why do we know that that's what this policy statement was getting at? Well, Your Honor, in 28 U.S.C. section 994T, Congress directed the commission to, quote, describe what should be considered extraordinary and compelling reasons and to include criteria to be applied and a list of specific examples. And do you think, you know, given the guidelines sort of nature these days, that the District Court is bound by those, that the agents, effectively the agency here, has dictated what the statute means by extraordinary and compelling? Yes, Your Honor, and Amendment 814 to the policy statement, which was passed November 1st of 2023, made it binding on the courts. The government cites to many cases before that date where the policy statement was not binding to people in Mr. Holley's position, but it changed. And here, under the policy statement, the commission lists four per se qualifications, metastatic cancer, ALS, end-stage organ failure, and advanced dementia. Maybe my question is, let me just ask, and then I'll stop and let my colleagues, but how is it made binding? I mean, the guidelines aren't binding on anybody, right? I mean, we live in a world where the guidelines are never binding on anybody. They might be procedural requirements. Why is, how is this one binding when none of the rest of the guidelines are binding? Your Honor, Amendment 814 made it binding on the court. Prior, it was only binding as to BOP motions, but on Amendment 814. But my point is sort of a broader one, that, you know, the guidelines the Supreme Court held are not binding as a general matter. Why would the policy statement here be binding when the rest of the guidelines are not binding? Well, Your Honor, Congress delegated that to the Sentency Commission under 28 U.S.C. Section 9914, and other courts have recognized as much, and the government has conceded as much in other cases. And, yeah, but I'm not sure that they can concede that we defer to the Sentencing Commission any more than we defer to any agency about the meaning of extraordinary and compelling reasons. Like, that seems like a legal question, right? They've given a view about it. Why post-Loper Bright and given the non-binding nature of the guidelines, why do we think about this as being a binding question? The ultimate question is still discretionary. It's still may for compassionate release. But the argument here is that he qualified to have his case heard on the merits here. And if the district court would have found that the 3553A factors didn't weigh in his favor, then they still have the discretion to deny it. They never considered them. But as other courts in this circuit, United States v. Solis and the Western District of Virginia held that in-stage renal disease is a per se qualification under the policy statement. Why would that be? I mean, I don't understand why we don't approach this whole situation on an individual by individual basis. I mean, there are questions where maybe someone has renal disease, but they're responding well to treatment. And there are situations where someone has renal disease, but they're not responding well to treatment. And you could find in one case, the district courts are splintered all over the place on this question. And the fact that the district courts may be reaching different conclusions on the matter may have more to do with individual factors that influence them. And I don't understand why, you know, if someone's cooperative with treatment, that might be one thing. But, you know, in-stage renal disease, it encompasses a wide universe of situations. You know, how old is someone? How well are they responding to treatment? And it seems to me that this process, when you read the statute, was designed to be one that gives the district courts considerable authority, because these plays to the district court's strengths, which are the individual, the circumstances may play a big role in the result. And if we try to take this process from one where we respect what the district court has done, and transmute it into a bunch of per se rules, it seems to me we're going, we're heading in a direction that's contrary to that which Congress intended. It might even find it backfiring on you in a situation where the district courts have ordered compassionate release, not just in this situation where they declined to order it and you don't like it, but there are going to be situations where the government's not going to like what the district court does that. But if you have a deferential standard of review, that works in favor of a criminal defendant or a particular inmate. So, all I'm saying to you is that your argument can cut two ways. And there are going to be a lot of situations where the government's going to be unhappy about it, about a compassionate release situation. And if there's, if we're bound by a bunch of per se rules and the like, and there's no deference given to district courts, we say fine. Well, your honor, I would disagree with the point that this is undermining congressional authority. In fact, I would argue what the district court did was undermine the congressional authority presented. The district court looked at this individual and the individual characteristics and whether he was complying with treatment and how well he was responding to treatment and what the situation would be in terms of the treatment accorded at the facility versus what the treatment would be accorded outside the facility. But all of this can turn on a bunch of individual determinations. And I think it's very, it's a path that's contrary to Gall to take this and transform it into a bunch of per se rules. As a point, the words are extraordinary and compelling. That's a high standard. And it suggests that, you know, individual determinations because what is extraordinary and compelling in one case may not be extraordinary and compelling in another case with different individual characteristics. Well, your honor, two points to that. First, it is not a case-by-case analysis. And that is what the policy statement says and other courts have found. United States versus Hickson found that it specifically qualifies. And the Eastern District of Virginia or Western District of Virginia and SOLAS, they found it was a per se qualification. The government conceded in both SOLAS and Mumford about this per se qualification. And to the second point there, even looking at the specific characteristics here of Mr. Hawley, it is still an abuse of discretion. Mr. Hawley is on a downward spiral and the record supports this. When Mr. Hawley was sentenced... But it seemed like to me there was evidence that some of that was his own making, right? He was failing to comply. And one of the challenges with this per se rule, right, is if you say that, you know, as long as you get this disease, you encourage people to not comply with the And maybe that's like fanciful, but it seems odd that your suggestion is that the district court can't consider these failures to comply with the medical process as determining whether this is like an extraordinary and compelling circumstance. Judge Richardson, so what the district court did here shows the need for, to our second point of the expert nephrologist, because it misunderstands what compliance here means. When you look at the record from our 161 instances of treatment, and they started at four hours per session, 139 of those, 39 he ended early for only 20 minutes due to cramping, extreme pain, worry that a kidney cyst might actually burst. That's on J466 because of the pain. And then when they ramped it up to five hours... Okay, so I understand the second argument you're making, and I, you know, could shift to that one, but that just ducks the question, which is like, if you had every expert in the world, your theory is it doesn't matter, right? Your theory is it doesn't matter if he literally ignores everything and did nothing and instead drank, you know, poison every day, that none of that would matter because, you know, if he's got a doctor that says in-stage renal failure, he passes the hurdle. Well, your honor, we're not arguing that that could never be considered. In the court, the cases that the government cites are more similar to what you stated about the United States versus June, that was... But if you have a per se rule, how could you consider it? I mean, your theory is that it's a per se rule. Well, it would be... You ought to stick with that. I mean, that's, it might be a good argument, but you can't have a per se rule that takes into account other stuff because then it's like sort of definitionally not a per se rule. Yes, your honor, and it could be considered holistically as compassionate release is, but the point here that he was complying, he was having up to, on JA-1013, up to 6,200 milliliters of fluid taken off at a time. That's 13.7 pounds. This is why he was ending treatment early. And to the second point here is that another reason he wasn't able to comply and he was gaining so much fluid was because of the inadequate diet he was receiving in the BOP. JA-103, he sends a letter to Dr. Dixon, his nephrologist, where he states that they're supposed to have kidney friendly, renal friendly diet options. That day it should have been either chicken or eggs. And the only option was pizza. There's another letter, JA-104 to 106 from a fellow inmate that states he tried to help Mr. Hawley with his diet, but the only way to get an adequate diet was through the commissary. And everything on the commissary is also not renal friendly. So he's actually, the problem is getting worse and he is on this downward spiral. He was at 15%, JA-134. Now he's, JA-737, he's at 4% kidney function. Mr. Hawley is in a severe downward spiral due to the... You're giving your view of it, but you're not quoting to me from district court findings. It's almost like, you know, listening to your argument that district court didn't really exist. I mean, isn't there something that you could quote to me from a district court finding that would support the point? We wish we could quote something from the district court's opinion about his need for a kidney, but the district court made no mention of his need for the kidney. So that's under a subsection C argument of whether he needed specialized care that he was not receiving. And here that is a kidney transplant. The only standard of care for a person with end-stage renal failure is a kidney transplant. Well, if you are on the outside, if you're released from incarceration, kidney transplants are very hard to get. Anytime you're talking about an organ transplant being a heart transplant or being a kidney transplant, there are often a significant shortage of organs out there. Whether you're incarcerated or whether you're not incarcerated, there's a long line. And it's not clear to me that somebody is going to get a kidney transplant if they're on the outside and not going to get a transplant if they're on the inside. Your Honor, Mr. Hawley has identified three people willing to donate him a kidney. That's JA57. And he has stated that because he's in prison, they're not even able to be evaluated for his kidney transplant. Mr. Hawley is only asking this court to reduce his sentence very modestly. Seven and a half months. The BOP indicator has him being released December 21st of this year. And for these reasons, we ask this court to reverse the district court's decision. Thank you. Judge Richardson. May it please the court. My name is Gabriel Price on behalf of the United States. And we're here asking that you affirm the district court's denial of compassionate release in this case. The district court did exactly what we expect district courts to do. It reviewed the records and it utilized its discretion in determining that there was no end of life trajectory presented in those records. Nothing in the records indicate that there's any kind of eminence or path towards death. Do you agree that end-stage renal disease is end-stage organ disease? I mean, kidneys are an organ. I agree that it can be. I agree. The government's position is that when looking at those, and a slight to the Alexander case in my brief, that court did a good job of describing how to view end-stage organ disease in the context of terminal illness. And looking specifically at, that's a general term for end-stage heart disease, end-stage liver. There's a lot of different conditions that could potentially impact there. Not all will be terminal. And in this case, the definition for terminal illness is a serious and advanced illness with an end of life trajectory. And the district court in this case found- End of life trajectory doesn't need to be within a specific time period. And people do die of renal failure when they have it, stage five. They do at some point. But again, what was before the district court and the research, it can be five to 10 years, it can be 20 years, it can be 30 years. There was nothing specific in this case as to Mr. Hawley, as to how his end-stage renal disease was progressing. There's no letter from his nephrologist. So you are then contesting the supposition that end-stage renal disease is end-stage organ disease. You're saying it's not necessarily the case. I am resisting the proposition that it per se qualifies as a terminal illness. Yes. I think for a terminal illness, you have to show both of those. And I think end-stage renal disease can be a terminal illness if, after looking at all the records, that is supported. And that's what the district court did here. And can you address this question that we were talking about with your friend regarding the policy statement and whether or not it's binding on district courts? I mean, I think that question was resolved in our Crawley opinion last summer. And Your Honor, I'm not familiar with Crawley specifically. I do know in talking about the Booker decision where the guidelines are no binding on the courts. Courts are given a lot of discretion. Now, I believe district court has an obligation to consult the guidelines, to review them, and to analyze the case under those. But again, I think the district court should be given latitude and discretion, especially in something like releasing compassionate release motions, where that really is the height of where a district court should have their discretion. They're in the best position to look at the entire case. Now, many times, the same district judge that presided over the case will be presiding over the subsequent motion as well. And in this case, you have the medical records provided show that the type of dialysis that this appellant was receiving, the LLE Waveland Q was working well. That's at JA 297. The most recent notes from the nephrologist, there's nothing in there indicating any kind of decline. There were, and that's JA 910 and JA 943. That was May 4th, 2024 notes, shortly before this motion was filed, indicated there's no complications with dialysis. The records that the district court had before and was reviewing, there's nothing in there that shows this decline. There was a fall that occurred roughly a month and a half prior to, I believe, the motion being filed. There's some sleep apnea, but nothing in regards to the end stage renal disease. The defendant's burden here, the appellant's burden here was to provide that to the district court. It didn't do that and it just simply is not there. The district court's discretion on that should be affirmed. Additionally, in looking at the specialized care with the transplant, there's nothing in the record that indicates a transplant, that this specific appellant is appropriate for a transplant. He never requested a transplant. In the letter that he sent- You said he never requested a transplant? There's nothing in the record that he requested a transplant through the Bureau of Prisons. Was he ever denied one then? No, because he never requested one. When he sent his initial request to the warden, the warden sent back a response denying it, but telling him he could raise that with his nephrolics. He said- One question I have here is that this is obviously a serious situation. It's true, as you say, that the outcomes on dialysis are significantly different and that the individual's situations are significantly, individual circumstances vary considerably. Maybe this is best asked to your opponent here, but I'm not sure why don't these cases of this sort go to an inadequate care within the facility as opposed to a motion for release? That's one thing because you have to have some sympathy for the individual in this situation. Dialysis has tremendous advantages and gosh knows what people would do without it. On the other hand, I have to believe that some prison facilities administer dialysis in a very effective way and other prison facilities probably less so. As I say, maybe this question is best directed to your opponent, but I'm wondering whether the same results or the same aims couldn't be met with an Eighth Amendment claim of inadequate care within the facility rather than a question of release where the standard of extraordinary and compelling is very high. I'm going to agree with you, your honor, about there is sympathy for a person in this scenario. However, the record in this case doesn't show inadequate treatment. The record in this case actually shows adequate treatment. He's getting the dialysis he needs to survive. Okay, but I suppose that would say something if we're talking about any condition and the treatment that afforded the condition would not support an Eighth Amendment claim or a claim of inadequate care. That would seem to diminish somewhat the case for an early release. Yes, your honor, I would agree with that. If he's being provided with adequate care and he's responding to that adequate care, I think that diminishes both an Eighth Amendment and- I'm wondering why the first resort in these cases should not be a claim of inadequate care. And if that's not going to go forward, it seems to me to diminish somewhat the extraordinary and compelling reasons for compassionate release because Congress has used some adjectives which suggest a very high bar, extraordinary and compelling. Yes, your honor, I agree with that. And I think that there are different ways to approach this. The appellant in this case chose to approach it through emotional compassionate release. I feel in reviewing the cases for here, that is quite common in the prison setting. There's a lot of emotions for compassionate release. I can't really speak to the Eighth Amendment claim. I think that would be something that the individual appellant would have to look at. But again, I agree. I think it comes down to that discretionary decision and that extremely high bar in reducing a sentence. District courts are given a limited authority to reduce sentences, and within that limited authority, they are provided that discretion. And in this case, I also want to point out, although the appellant did state in his motion that he had three individuals that were willing to provide a kidney for a transplant. He says that the care was inadequate because it caused him a lot of pain. What is your response to that? I didn't take his argument specifically as it's inadequate because of the pain. I believe the argument is that he's saying the dialysis is causing pain, so that's why he's ending it early. And he wants to pursue a kidney transplant and names, or doesn't name, says a sister and two friends without naming them or providing any evidence. If the problem is that the dialysis is causing pain, do we know if the dialysis was performed outside of the institution, would that cause less pain or is it? That would not be in the record before the district court. I do know that in this case, the medical records provided do state that dialysis was working well for the appellant. So the medical records say that the dialysis was working well? Yes, Your Honor. It says there are no complications with dialysis. It says the LLE Waveland Q, which I believe is the extension. So is there a reason to believe that if they were released that the dialysis would be working less well? I think the reasonable interpretation of that would be it would be working the same. I don't think it would be any different. I think dialysis within the prison setting or outside the prison setting three days a week. I've got a lot of questions that I'm just, you know, it's easy to say, well, you're hard-hearted. You know, you've got a person with something that we would all extend our sympathies to. It's a sad situation, all of this. It's a very sad situation. But, you know, it's not being hard-hearted. It's a question to try to find the answers to how we square what's happening here with what Congress, the language that Congress used, and the facts that the district court found. At any rate. And I agree. It's a very tough decision. And that's why the district court has that discretion yet again, and why the burden is ultimately placed on... Yeah, I mean, one of the questions you have is given the condition, and it's a serious one, is release the answer? And I would say if you're looking at it from an equitable standpoint of what compassionate release is supposed to be, you know, to get treatment outside, better treatment outside, there's nothing indicating that you would get better treatment outside. There's nothing indicating you would actually get a transplant. It's a very difficult process. The question I have is, the condition is a sad one, but is release the answer? And I don't know. I think the district court answered that with its order denying release. And specifically, when looking at the non-compliance issues, I think the district court considered those. And looking at the list of what he's specifically purchasing from the commissary, chips, cookies, things that are not good, they're phosphate added foods. Additionally, he stated that... I'm not prepared to be hard-hearted on this kind of thing. But if I'm just given some reasons that in the findings of the district court that release would be the answer to what we all think is a serious problem, then it becomes a different case for me. Because you could say, yes, compassionate release is called for because this is going to be substantially better. But that point has not been developed. That's correct, Your Honor. The court, the district court down below specifically was focusing on the first step of extraordinary and compelling circumstances. It explicitly declined to address the administrative remedies point raised by the United States, and it did not address the 3553A factors. If my friends on the other side ask this court now to remand with instructions to grant compassionate release, that would not be appropriate. If this court did remand, it should be to consider the case, the 3553A factors and the administrative remedies question for the first time, as it has not considered that prior. Well, let me ask you this. Would you... But in order to remand, we would have to decide that this was, that the district court had erred in finding no extraordinary and compelling reason. That's correct. And that's why today we're asking that you affirm on that ground because the district court did not abuse its discretion in that finding. However, the, I guess, fallback position of the United States is that if this court disagrees and finds that the district court did abuse its discretion on that first question of extraordinary and compelling circumstances, then the proper remedy would be a remand for consideration of the 3553A factors. An extraordinary and compelling reason is open to the district court discretion in the same way that the consideration of the individual factors were. Yes, I believe that is true. The questions around compassionate release should always be in the discretion of the district court. And that's why we're asking to affirm on that discretion. The case cited by Appellant, the Malone case, that did remand with instructions to Grant was a very exceptional case where he'd already actually been released to home confinement. So he was no longer in the prison setting. They already found... Can I back up to the question that I bothered your colleague on the other side with? And you can just say you don't have a view on this because I'm not trying to pin you down. But it strikes me as odd that we care so much about what the sentencing guideline says here. It seems like, you know, the Supreme Court has this compassionate release case before it now called Fernandez. And they debate about what falls within extraordinary and compelling circumstance. And nobody in that case, the court nor the parties, thought that the guidelines were controlling or binding in some way. They're trying to look at what the statute says and what it means. And I guess I can't tell whether that's just like a post-slope or bright that, you know, we have a statute and so we should look to the statute rather than, you know, the sentencing commission's, you know, riff on what extraordinary compelling circumstances mean. Do you have any like insight to share with me? There seems to be this premise in the briefing, but also in some other cases like Crawley, that get to the question of whether this guideline is like in any sense binding on the district court. And it seems ambiguous to me at best. And it seems a little inconsistent with Fernandez that all this argument and nobody's like, oh, we should be looking at the guidelines. I mean, I think they cite them in the brief somewhere, but the argument is not about what the sentencing commission said. It's about what does the Dern statute mean? Well, you've presented this case as a question about the sentencing guidelines. I acknowledge that. But why is it not really a question about what the statute says? And we can give Skidmore deference all we want to the sentencing commission, but nothing more. I would say I don't think that's really been delved into in the briefing. Yeah, that's obvious. But I would say that when looking at what Congress has done, you always start with the text of the statute. I think the sentencing guidelines are a good tool for the district court to use. And I think that's the way that the district court should view them when looking at. But if it's just a tool like the failure to like, you know, follow them to the letter, it doesn't seem like an abuse of discretion, right? If instead, it's a binding, you know, mandate on the district court, which is sort of how it has been presented here, then the failure to follow them to the letter is a real problem, right? So it sort of matters what we think this is. You just said it's a tool. That seems fine to me, but I don't know where I get that from other than the sort of notion that we really are bound by the statute and not the sentencing commission's, you know, riff on what they think is a extraordinary and compelling circumstance. Yes, and I would go back to kind of the Booker formulation with the sentencing guidelines there as well and how that's taken in. I think in this case, though, such as other cases where we talk about substantial reasonness of sentences, there's always, the district court may always abuse discretion in certain ways. You know, if it wholly disregards everything and doesn't consider things and just kind of doesn't follow any kind of standards, I think that would be an abuse of discretion. That's not what we have in this case. In this case, I think the question you're asking isn't necessarily dispositive of anything. A per se rule would not be an appropriate rule. I think appellate courts are typically not in favor of creating these per se rules. And it just would be odd to create a per se rule in a non-binding policy guideline, right? That's sort of like oxymoronic, right? Like to have a per se rule that's not binding on anybody doesn't seem to make sense. But if it is binding, then maybe a per se rule makes sense. Anyway, y'all haven't argued all this. I'll let you go with that. I see we're out of time. So I would just ask this court to affirm the district court's denial of compassionate reliefs in this case. Thank you. Your Honor, three points on rebuttal. First, to address Judge Richardson's question about the policy statement, again, Congress directly delegated this to the Sentencing Commission under 28 U.S.C. section 994T. And the error of law that this court reviews de novo under its United States v. Mitchell question of the interpretation of the guidelines, the district court didn't engage with it at all. It listed a specific example in the policy statement for end-stage organizes. It never mentions that at all. And to Judge Berner's earlier question to my colleague, there's no reason why Mr. Hawley's did not qualify here. And to have something, there would have had to been something in the opinion to say why his is different than the specific example Congress asked the commission to provide. And to the United States v. Alexander case that the government cites, that specifically was a stage four end-stage renal, it was not end-stage renal failure. So this idea that it's an individualized assessment because of United States v. Alexander is wrong. That court specifically said if it was... District courts all over the country are splitting on this. And wouldn't that suggest that the question of extraordinary and compelling is not to be answered categorically, but would reward individual inquiry? No, Your Honor. In fact, the question, the courts really aren't splitting on this issue. There's a few outliers before the policy statement became binding under Amendment 814 where they went the other way. But the overwhelming majority are finding end-stage renal failure as the Western District of New York recognized United States v. Davis. District courts have regularly found end-stage renal failure to qualify under the guidelines. So you're saying that the extraordinary and compelling is purely a question of law and that the other is a question of fact? Yes, Your Honor. The 3553 questions are a question of fact, but this is a question of law. And you don't disagree that the issues of the two issues that your colleague on the other side said would need to be addressed in the first instance by the District Court to address those issues in the first instance? No, Your Honor. This court should address it as it did in United States v. Malone because of this extraordinary situation where Mr. Hawley is in dire need of a kidney transplant. He has been on dialysis for over five years. The average life expectancy on dialysis is five to ten years, and only 35 percent of dialysis patients make it to year five. Mr. Hawley needs this now, and because of the urgency, we asked this court to find it because the 3553A factors weigh heavily in Mr. Hawley's favor. He's asking for a modest reduction by this court, and he is not a violent criminal. He has shown no violent hit pattern in prison, and he has shown that he is being rehabilitated. He has completed many different courses, J71, and has been a model prisoner. Why in the world would we just ignore this and short we're going to make findings of fact up here? Well, Your Honor, because of the urgency and because Mr. Hawley needs this transplant, that is why we're asking for this extraordinary remedy. Did he ask for the transplant? Yes, Your Honor. Your opposing counsel said he never asked for it. J85, he stated to the warden, I want to get a kidney. That was his whole reason for this. He has stated he has people willing to donate. He's wanting to get the kidney. That's the point here because a kidney functions 24-7. To the government's point that he has not shown any deterioration on dialysis is wrong. He went in with 15% kidney function, JA134, and is now at 4% kidney function, JA737. The idea that dialysis is working well is also wrong. He's having cramping. He's had to stop. He has dialysis-induced nausea, lethargy. Can you release the answer to this? Yes, Your Honor, it is because that allows him to get on the kidney transplant process and to get this chance at life again. His mother died from the same disease. It's a genetic disease, polycystic kidney disease, which is on the record at 94 and 134. His mother died of this. He has had five heart attacks. He has heart disease, chronic lung disease. This is all JA85 and 134. Every day, he's on dialysis. He gets dialysis three times a week for five hours at a time. That means the other 153 hours of the week, his body is filling with fluids, with toxins that he cannot expel through urination, and it's causing extra pressure on his heart, on his lungs, and everything else. That would be the effect of dialysis outside of the incarceration, would it not? Well, Your Honor, yes, but it allows him to start the kidney transplant process, which he is not able to do in prison. For all of these reasons, to prevent Mr. Hawley's sentence from being- Why didn't you bring an Eighth Amendment claim of inadequate treatment or inadequate care? Your Honor, I see how my time's expired. May I answer your question and briefly conclude? Sure. Well, Your Honor, this goes to kind of a second issue of the failure to appoint counsel. Mr. Hawley is a man that's on dialysis that realizes that he, JA101, that he has such post-dialysis exhaustion, he misses scheduled medicine distributions because he's asleep and he's so tired. To have him bring all of these claims pro se, without counsel, a man that is so tired and when he's not hooked up to a dialysis machine that is dying, we would bring that claim if he had been appointed counsel, but he was not. For these reasons, to prevent Mr. Hawley's sentence from becoming a death sentence, we ask that this court reverse the district court and remand with instructions to grant compassionate release to Mr. Hawley to give him a chance at life. Thank you. Thank you. We will adjourn court and come down and greet counsel. This honorable court stands adjourned until this afternoon. God save the United States and this honorable court.
judges: J. Harvie Wilkinson III, Julius N. Richardson, Nicole G. Berner